Page 1

1                UNITED STATES BANKRUPTCY COURT

2                 SOUTHERN DISTRICT OF FLORIDA

3

4                   Judge Erik P. Kimball

5

6

  In Re:

7
                          Case No. 09-31881-BKC-EPK

8

9  BRITISH AMERICAN INSURANCE
   COMPANY LIMITED,

10
                       Debtor.

11
   _____/

12

13  HEARING RE: PETITION FOR RECOGNITION OF FOREIGN
            PROCEEDING CHAPTER 15 (1)

14

15

16                    May 14, 2010

17

18

19  The above entitled cause came on for hearing before
    the HONORABLE ERIK P. KIMBALL, one of the Judges in

20  the UNITED STATES BANKRUPTCY COURT, in and for the
    SOUTHERN DISTRICT OF FLORIDA, at 1515 North Flagler

21  Drive, West Palm Beach, Palm Beach County, Florida,
    on May 14, 2010, commencing on or about 10:00 a.m.,

22  and the following proceedings were had:

23

24

25     Reported by: Jacquelyn Ann Jones, Court Reporter

1

APPEARANCES:

2

3   GRAY ROBINSON

By: LEYZA F. BLANCO, ESQUIRE

4        ELENA CHRISTIANSON, ESQUIRE

On behalf of Brian Glasgow

5

6   THE DUBOSAR LAW GROUP

By: HOWARD DUBOSAR, ESQUIRE

7        ROBERT SHERES, ESQUIRE

On behalf of Green Island Holdings

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good morning everyone.  Please

2   have a seat.  Let's have appearances, please, in the

3   British American matter.

4          MS. BLANCO:  Good morning, Your Honor.

5   Leyza Blanco and Elena Christianson from the firm of

6   Gray Robinson, on behalf of Brian Glasgow, the foreign

7   representative in the matter.  Also with us today is

8   Mr. Glasgow's partner from KPMG, John Lopez.

9          THE COURT:  Good morning all.

10         MR. DUBOSAR:  Good morning, Your Honor.  May

11   it please the Court, Howard DUBOSAR And Rob Sheres on

12   behalf of Green Island Holdings.

13         THE COURT:  Good morning, gentlemen.

14         Ms. Blanco, so we have today the 1521 relief

15   request, I believe.

16         MS. BLANCO:  We do, Your Honor, and the

17   Court has set this hearing in order to determine what

18   the scope of the stay would be issued in connection

19   with the recognition of this proceeding as a foreign

20   non-main proceeding.

21         And to that end, Your Honor, the foreign

22   representative seeks relief under 1521 from this

23   Court, essentially that provides that Sections 361 and

24   362 of the Code would apply with respect to British

25   American and the property of British American within

1   the territorial jurisdiction of the United States.

2   That also 363, 549 and 552 would apply to any transfer

3   of such property that's within the jurisdiction of the

4   United States.

5           And I'm essentially reading verbatim,

6   paraphrasing to some degree, but reading from the

7   relief provided under 1521 seeking essentially all the

8   relief available under that statute for either a main

9   or a non-main proceeding, understanding that this

10  Court has discretion to adjust the scope of that with

11  respect to a foreign non-main proceeding and the stay

12  that's granted in connection with it.

13          Essentially, Your Honor, in short, other

14  than going through and reciting each of those

15  sections, we're here today asking this Court to grant

16  the relief that's available under 1521 to this debtor

17  under this proceeding as recognized as a non-main

18  because it's within this Court's discretion to do

19  that.

20          Essentially, Your Honor, as the Court is

21  aware, the assets of this debtor are far and wide, and

22  although we've already identified two of the main

23  assets which we believe require this Court's stay as

24  necessary -- and that the stay is necessary to protect

25  and preserve those funds, we also don't know if, in

1    the process of examination and looking at information

2    which this Court has the ability to permit the foreign

3    representative to conduct here in the U.S., whether

4    additional assets might be ascertained.  Given the

5    nature and the scope of the liabilities, as well as

6    the assets of this debtor, it's not unlikely that that

7    would be the case.

8         So while we are focused on the essential

9    issues for the moment, which are making sure that the

10   funds of money which are liquid and are contained in

11   certain accounts, that they be preserved, and that the

12   foreign representative be entrusted to make sure that

13   they are within his control and not subject to -- or

14   otherwise be in jeopardy subject to someone else's

15   control.

16        We do not want to limit the request today to

17   just those assets because those are the ones we know

18   of.  We want to ensure that this Court is aware that

19   there is to some degree the possibility that other

20   assets may exist that we just aren't aware of at this

21   juncture, and because of the inability to do any sort

22   of examination under a court proceeding in the U.S.,

23   we may not have discovered them just yet.

24        So in that case, Your Honor, we are asking

25   that the Court also issue an order that requires that

1    any assets be entrusted to Mr. Glasgow, and use

2    language including these certain funds that we are

3    aware of in a very broad way, but using the name of

4    the fund manager and the fund representatives, and

5    also one other account which we are aware of, but also

6    not limiting it to just those, because those are the

7    ones we know of.

8           And we would like the Court to order that

9    the foreign representative is permitted to move that

10   money into an account that he controls to protect and

11   preserve the value of the funds.

12          THE COURT:  Can you tell me something about

13   that.  And I assume the accounts you're talking about

14   include the Corban Fund, and that must be implicated

15   in the litigation that Green Island is involved in;

16   correct?

17          MS. BLANCO:  That's correct, Your Honor.

18   The Corban Fund is really the more valuable of the

19   funds.  There, from our knowledge, appear to be

20   several funds, all of which, at this juncture, when

21   this process began, there appeared to be some that

22   might not have matured, but with the passage of time

23   we believe that now all the funds should be matured

24   and liquid and available to be moved from those funds.

25          THE COURT:  So there were some investments

1   that represented investment contracts that were not

2   otherwise -- had not otherwise matured, or were not

3   liquid, or possibly would involve penalties at some

4   point?

5           MS. BLANCO:  Right.

6           THE COURT:  What were they, do you have any

7   idea?

8           MS. BLANCO:  Well, Your Honor, they're

9   investment funds similar to hedge funds.  And one of

10  them had a maturity of January of 2010, which has now

11  since passed.  And the problem we have, Your Honor, is

12  that, in respect to what the foreign representative

13  has been able to ascertain, the latest available

14  information in respect to the value of the fund dates

15  back to March of '09.

16          And there have been various requests for

17  over a year now to have money transferred in some

18  cases, and to get information, and to some degree

19  there's a concern about the actual availability of

20  this money, although technically speaking, it should

21  be available and liquid.

22          And so absent this Court's order, it has

23  been impossible to ascertain that the funds are

24  actually there, and it's actually wholly appropriate,

25  given the nature of the assets, that the funds be

1    moved immediately.

2              And obviously, in this particular instance

3    they are subject to subscription agreements, and we

4    have not -- at this juncture, because we haven't been

5    able to ascertain the value of the fund for a year

6    now, looked at the more detailed issues about the fund

7    transfers and what if the funds are ordered

8    transferred into the foreign representative's

9    control.

10             But clearly, at a cost, or without a cost,

11   it's appropriate to have this Court address that

12   immediately because we believe that the funds are in

13   jeopardy.

14             THE COURT:  Are they in the name of BAICO

15   itself or some other entity?

16             MS. BLANCO:  They are in the name of BAICO

17   itself.

18             THE COURT:  And these are funds that you

19   have traced back to the St. Vincent branch?

20             MS. BLANCO:  Well, there are -- Your Honor,

21   the way that the funds were funded, they came from

22   several different branches, but there is a majority of

23   the funds that actually did come from the St. Vincent

24   branch.  But BAICO, being one entity, not distinct in

25   terms of its branches, made requests for fund calls

1  from all different branches, whoever had liquid money

2  when it wanted to make an investment, got basically a

3  letter asking for it to wire its funds into X, Y or Z

4  investment.

5           And it just so happens, to answer your

6  question, that there are several wires in the Corban

7  Fund from the St. Vincent branch.  But that's not to

8  say that the St. Vincent branch specially has an

9  interest in it.  There has been an allegation in the

10  proceeding, the St. Vincent and the Grenadines

11  proceeding, that perhaps there's some pledge of the

12  funds which would entail the entire amount for the

13  benefit of some special interest in St. Vincent and

14  the Grenadines.  But in Mr. Glasgow's report he has,

15  in fact, reported that they are looking into it and

16  have referred it to legal counsel, but he does not

17  believe that that claim is valid.

18           In any event, Your Honor, the point being,

19  that in respect to BAICO, the issue of where the money

20  came from isn't as important as the fact that it's

21  BAICO's property here in the U.S.

22           And so with that stated, given Mr. Glasgow's

23  mandate, which is extra territorial based on his

24  appointment order, it's proper for this Court to

25  permit Mr. Glasgow to move the money and entrust him

```
 1    with the power and the obligation to protect it.
 2              And it's not really all that relevant
 3    whether or not the funding of that fund was from one
 4    or the other branch, although clearly, it has a lot to
 5    do with money coming from St. Vincent in this
 6    particular example.
 7              THE COURT:  Well, one of the things I have
 8    on the bench here, it's an item that was submitted
 9    in the trial on the petition, it's a report of the
10    judicial manager from October 9th, 2009.  And if
11    you were to look at Section 5.3.1, it shows, and these
12    numbers are -- these amounts have been put into DC
13    dollars, there's an exchange rate in the report, so
14    these aren't U.S. dollars I'm quoting, but it shows
15    that the St. Vincent branch was the source of 43.4
16    million, approximately, of funds invested in the Green
17    Island project.
18              Has anything changed, or has any new
19    information come to light since this report was
20    issued?
21              MS. BLANCO:  No, Your Honor, I think that
22    that -- although that references the project itself,
23    not necessarily the Corban Fund.
24              THE COURT:  Right.  Which is independently
25    addressed.
```

1          MS. BLANCO:  But I don't know that there

2    is -- if you give me a moment, I'll confer with my

3    client.

4          The Court should be aware that this was the

5    last report that the Court has received.  Since then,

6    as the Court is aware, there was a subsequent order

7    with directives from the Court and an extension

8    requested in respect to the next report, which should

9    address the scheme of arrangement, which that has not

10   yet come to fruition and the report has not been

11   filed.  So the Court is actually looking at the latest

12   report filed in the case.  But if you give me a

13   moment, I'll ask Mr. Glasgow if there's been any

14   update on that end.

15         THE COURT:  Well, in any regard, with regard

16   to information that may have been discovered relevant

17   to where the money came from, I understand your

18   argument that that's not necessarily the right, or the

19   right crux of the analysis today, but I'm curious as

20   to whether there's any new information.

21         MS. BLANCO:  Just a moment.

22         Your Honor, the foreign representative and

23   his colleagues on behalf of BAICO are conducting a

24   forensic review, but that's in process, and as the

25   Court might imagine, it's a pretty huge task, so there

1   hasn't been any update to that amount.

2           But I'm advised that as represented in this

3   report, that there were a number of branches that

4   funded the Green Island transaction, separate from the

5   Corban Fund, and in fact, that's the latest

6   information that they have available, which is that

7   that sum of money came from the branch.

8           But it was similar in structure to the way

9   the Corban Fund, or the Corban Fund investment was

10  funded.  Different branches, when the decision was

11  made by BAICO to make the Green Island investment,

12  different branches provided the necessary funds.  So

13  that just happens to be what has been documented

14  in the consolidated financial statement, and now as a

15  result of this report, in respect of the St. Vincent

16  portion.

17          THE COURT:  Understood.  All right.  So the

18  focus I realize -- let's set aside for a moment other

19  assets that you may know about, outside of the Green

20  Island investment, what is there that is known at this

21  point?

22          MS. BLANCO:  Well, the Green Island

23  investment is just that, and that's an investment in a

24  piece of real estate owned by a subsidiary.  So that's

25  really not within the scope of the stay at this

1   juncture for this Court.

2          THE COURT:  Another case entirely.  But

3   there is a piece of litigation, obviously Mr. Dubosar

4   is here, he has some interest in it, can you tell me

5   what that litigation was about, refresh my memory a

6   moment.

7          MS. BLANCO:  Yes, Your Honor.  I need to go

8   back to explain the agreement and transaction, it's a

9   fairly complex one.

10         But essentially, Your Honor, the Green

11  Island ventures is a subsidiary, a Florida subsidiary,

12  which bought a company, which owned a piece of land in

13  Osceola County.  And essentially the company had

14  acquired that land the same day for a significant

15  amount of money, and then immediately sold those

16  interests in that company to BAICO for a lot more

17  money, contemporaneously.

18         And so what ends up happening as a result is

19  that, in connection with that purchase, they also

20  essentially fund -- or not fund, but borrow money from

21  the seller to the tune of 140 million dollars in

22  connection with the purchase of the land, and also in

23  connection with the purchase of the membership

24  interest in the company that owned the land, borrowed

25  allegedly money from Mr. Dubosar's client.

1          There is one piece of litigation, which is

2     the subject of Mr. Dubosar's client and its claimed

3     debt resulting from that transaction, which was the

4     membership interest transaction, that is pending

5     in the District Court.  And there was at the time that

6     this case was filed, also a similar action relating to

7     that same debt against BAICO in Osceola, which was

8     stayed as a result of this action.

9          The pending District Court action initially

10    involved BAICO.  BAICO was dismissed out because the

11    guarantee contained some venue language, and now what

12    remains is only the same claims on that debt relating

13    to a subsidiary of British American Isle of Venice,

14    which was recently --

15          THE COURT:  Which is another petition, or

16    are subject to another petition.

17          MS. BLANCO:  Correct.

18          MR. DUBOSAR:  That Judge Hyman sent over

19    your way.

20          THE COURT:  Yes.  He was only too happy to

21    send it over, I'm getting the impression.

22          MS. BLANCO:  Now, there's also, which I'm

23    not sure we've had much discussion about this within

24    the Green Island structure, but there is also a

25    pending foreclosure by the owner of the mortgage of

1    the property against the Green Island Ventures entity,

2    and they have sought to foreclose their mortgage in

3    Osceola County as well.

4         And so that relates to the sort of land

5    transaction whereas the debt litigation from Green

6    Island Holdings relates more to the sale of the

7    membership transaction.  And there are concerns from

8    the foreign representative that there may be claims

9    resulting from the nature of the transactions, both

10   from a land deals perspective, and from the membership

11   sales perspective, which may arise, or which may cause

12   to arise claims on behalf of the estate.

13        And so those are sort of claims that are

14   being analyzed at the moment as well in respect to the

15   BAICO case and the related affiliates involved in the

16   Green Island.

17        THE COURT:  And those would be claims

18   against the respondent who is here today.

19        MS. BLANCO:  Essentially, yes.

20        THE COURT:  Okay.  And this is an

21   undeveloped parcel, I take it.

22        MS. BLANCO:  It is -- I actually now can

23   speak to the Court from personal experience, because

24   just this week I was in Osceola County on Tuesday and

25   I walked through the 6,000 acres of land that consists

1    of the Green Island Ventures property.

2            What it is, Your Honor, it's 6,000 acres of

3    essentially farm land.  They have a thousand head of

4    cattle.  The Green Island Ventures entity leases it to

5    the Parton family, who are the original owners, who

6    are cattle ranchers, and they maintain the

7    agricultural exemption on the property and use it as a

8    cattle ranch for the moment.  But the property does

9    have entitlement subject to a DRI order from the

10   County.

11           And actually the Court may even be familiar

12   with it, because it is a piece of property that

13   uniquely sits on both sides of the Turnpike.  So it is

14   one of those unique parcels that has an overpass.  So

15   when you drive from say Palm Beach to Orlando on the

16   Turnpike you're driving essentially under the

17   overpass, which is essentially on both sides, includes

18   the Green Island Ventures property.

19           THE COURT:  But there's no obvious

20   infrastructure, it's currently agricultural?

21           MS. BLANCO:  There's no obvious

22   infrastructure.  There are a few out parcels that

23   contain homes, sort of ranch homes, the typical sort

24   of home you would find on a farm, and there's an out

25   parcel on one piece, and I'm giving more detail than

1    probably the Court wants, but essentially that was

2    sold off and is being used by an unrelated party.

3            But if the Court looked at a sort of

4    overhead map, or walked through it like I did, it's a

5    big farm.

6            THE COURT:  Now, in terms of the accounts

7    that exist that the petitioner knows of, there's the

8    Corban account, or whatever the investment fund is.

9    What else is there out there?

10           MS. BLANCO:  There's also a Wells Fargo

11   account, Your Honor, that is in BAICO's name.  It has

12   a reference, and also the Court has that statement

13   admitted into evidence in this case.

14           It is a Wells Fargo bank account.  I believe

15   it's in the range in dollars -- actually there are two

16   bank accounts that we know of, of a couple of million

17   dollars, and it's in the BAICO name, but there's a

18   reference to Panama in that.  They're trying to

19   ascertain whether there's any special interest or any

20   Panamanian creditors or otherwise in respect to those

21   funds, but they are BAICO funds as far as the foreign

22   representative is concerned.

23           And with a proper court order, the foreign

24   representative would also seek to protect and preserve

25   those funds and put them in an account, subject to

1  this Court's order here in the U.S. to move them and

2  control them under this process.

3          THE COURT:  And as I remember, looking long

4  ago back to, I believe November, there was some

5  concern about one of the accounts, I'm going to ask

6  Mr. Dubosar the same question, did Mr. Dubosar's

7  client claim a lien on or other interest in or attempt

8  to attach any of the accounts at any point?

9          MS. BLANCO:  Not by process, Your Honor.

10  I think that that was a perceived source of litigation

11  result that was then stayed, or it could have been on

12  a prejudgment basis something sought during the course

13  of the litigation as any litigant would do, but that

14  never occurred because of the filings, which prompted

15  the stay.

16          And so that doesn't mean that that couldn't

17  happen if the Court did not grant the broad enough

18  stay.  So the issue at hand is to prevent the

19  continued execution, or the potential claim of a lien

20  attaching to the fund.

21          Now I should say, Your Honor, that there is

22  a transaction which is a modification that occurred in

23  respect to the membership transaction to which Mr.

24  Dubosar's client was involved, and it involved a

25  transfer of a portion of investments in these funds,

1    in the Corban funds.

2         And I've seen certain of the loan documents.

3    I'm not certain that's what the Court is asking,

4    because I think the Court is more directing the

5    question to whether or not the creditor has actually

6    sought either judgment lien or attachment lien or

7    whatever lien would be appropriate by process.

8         But the Court should be aware that Mr.

9    Dubosar's client, in connection with the transaction,

10   at some juncture allegedly by consent as part of a

11   papered written transaction, did obtain a part of the

12   Corban fund investment in connection with that loan

13   transaction.

14        And that's important, because it's a nuance

15   that perhaps the Court was not aware of.  And I don't

16   really know all the details of that, and that was not

17   made part of the court record in this --

18        THE COURT:  So why does this fund exist, was

19   it used as part of the purchase price, was it

20   collateral --

21        MS. BLANCO:  Well, it was actually an

22   investment fund.

23        THE COURT:  Independent, at least in the

24   petitioner's mind, independent of any of the Florida

25   real estate investments?

1          MS. BLANCO:  Correct.

2          THE COURT:  Is it a real estate based fund?

3          MS. BLANCO:  Well, it appears to at least --

4   at least from looking at the documents that I've seen,

5   Your Honor, it appeared that to some degree it was.

6   Because in connection with that modification I just

7   referenced there was a couple of real estate

8   investments that were tied to the fund, and those were

9   transferred to Mr. Dubosar's client in connection with

10  the note transaction that ended up being modified, and

11  there was an exchange of value in connection with the

12  funds in that regard, and those moneys, I think were

13  tied to a real estate investment.

14          But I'm not certain as we stand here, based

15  on the information available to the foreign

16  representative as of March of '09, what exactly the

17  funds were invested in.

18          At the moment we believe that they should be

19  liquid, but we just don't know.  It could very well

20  be, Your Honor, that after this Court considers this,

21  if the Court were to enter an order authorizing the

22  foreign representative to take control of the funds,

23  that once we get down to the bottom of it, the funds

24  may not be there.

25          So I can't really answer the question

1    because the foreign representative only has so much

2    information.  And unfortunately until someone comes in

3    from that fund, or otherwise and says, tells this

4    Court where that is, we're not going to know.

5         THE COURT:  So you're looking for the

6    enumerated relief in 1521, plus you said effectively

7    you wanted the full impact of the automatic stay under

8    362, and you also mentioned the adequate provision and

9    363 and also 549.

10        MS. BLANCO:  And important in this exercise,

11   particularly for the reasons that we've just

12   presented, is the power this Court can grant to allow

13   Mr. Glasgow to conduct examinations of witnesses and

14   ask for discovery in the U.S.  Because there's a firm

15   belief that there's a lot more to some of the

16   transactions that have already been identified that

17   perhaps we're not aware of, and that there may be

18   other things out there that are important.

19        The one other thing that I've noted in my

20   presentation that I believe is important for the Court

21   to consider, is that there's at least one case, Your

22   Honor, where the Court notes -- and the case is the

23   Pro Fit International Limited case, which I believe

24   was cited in our papers in respect to recognition, but

25   in respect to the scope of stay, I think it's got a

1    nuance in it that perhaps is relevant here.

2              And the Court notes that in its opinion,

3    although it's an opinion relating to a recognition of

4    a foreign main proceeding, it does speak in its

5    opinion about what the nature of relief would be

6    available if there were a non-main proceeding.

7              And clearly it's dicta, but what the Court

8    says, and this is the Bankruptcy Court of the Central

9    District of California, what the Court says is, and

10   it's Judge Buford, that no one in that case argued

11   that in the foreign proceeding, or in the foreign

12   non-main proceeding, that was recognized by the Court,

13   that in that jurisdiction there was a stay, and that

14   the stay issued in that proceeding covered all assets

15   wherever located.  Similar to what this Court's stay

16   does when a debtor files bankruptcy here.

17             It's of no moment to this Court when a

18   Chapter 11 debtor comes before it that the Chapter 11

19   debtor's property is in Canada, and if there's a

20   creditor who has perhaps a presence in the U.S. and

21   also in Canada, that this Court expects that the

22   creditor basically abide by the stay, even though the

23   property is across the border.

24             THE COURT:  Some of my colleagues have had a

25   lot of trouble enforcing that provision.

1          MS. BLANCO:  And that's the reason why

2    Chapter 15 is here, and that's the reason why the

3    monologue exists, because as we become a more global

4    world we need to have the recognition to enforce those

5    orders.  But that does not mean that the order doesn't

6    exist that stays the proceeding.

7          And what I think is important to note about

8    Pro fit, just so that the Court knows where I'm

9    referencing is, it's headnote 30 and 31, but it's

10   footnote 45, where the Court notes that no one raised

11   this.

12         But I want to be clear -- I mean I want to

13   make sure that at least in this presentation that I

14   raise it, and that is that the scope of the stay

15   that's granted under the Insurance Act, and it's

16   Section 52 4, it is very similar to the extra

17   territorial stay that would be granted here and in

18   most other insolvency laws around the world, which

19   provide that all processes against the company shall

20   be stayed.

21         It doesn't say only here in St. Vincent, or

22   provide a limitation, similar to the words of the

23   Court in St. Vincent when it empowered Mr. Glasgow to

24   go find assets, wherever located, and bring them

25   within his control, the stay statutorily also does the

1  same.

2          And the Court, giving Mr. Glasgow directives

3  and empowering him as the judicial manager does, does

4  employ a statutory mandate that requires that stay to

5  be extra territorial, meaning that in effect, as we

6  stood here, there is a stay.  Whether or not a

7  creditor in America abides by it or not, is up to this

8  Court, but effectively this Court has recognized the

9  St. Vincent proceeding as a foreign non-main

10 proceeding under this Court's criteria.

11         And so to give that Court's already imposed

12 stay the same broad discretion that it has here, is

13 what Chapter 15 is all about.  And if the Court reads

14 the appointment order, which is, I think the most

15 instructive, in paragraph 6(a) the Court essentially

16 says that the judicial manager is discharged of

17 obligations, includes, to bring all the assets of the

18 company and take all steps necessary, and I'm

19 paraphrasing, but, and to bring them under their

20 control and bring the same into this jurisdiction of

21 the Court and seek assistance of Court --

22         THE COURT:  I'm aware, and it's a very long

23 section, and I quoted it entirely in my opinion.

24         A couple of questions.  I think Section 362,

25 if I were -- if you were to get the requested relief

1    with regard to 362, the adequate protection provision

2    is automatically involved.  Why ask now for

3    independent relief under 363, 542 and 549, when you

4    don't have anything you're asking for?  I mean, if

5    there's a turnover that you want for example, why not

6    come back and ask for the right to do a turnover?

7            MS. BLANCO:  Well, Your Honor, because

8    essentially at this juncture we have funds we've

9    identified and we need them turned over.

10           THE COURT:  Well, you would still have to

11   file an independent motion, even if I said that the

12   foreign representative has the power.

13           MS. BLANCO:  Well, Your Honor, that's only

14   if, at the time that the recipient of the order and

15   the directive to transfer the control decides that

16   they're going to violate this Court's order, or

17   challenge this Court's ruling that, in fact, Mr.

18   Glasgow has the power to seek turnover.  Because what

19   you might find --

20           THE COURT:  I have a concern here.  I don't

21   know who these other parties are that have the funds,

22   but they may have concerns they didn't know that you

23   were asking for specific funds to be turned over.

24   It's one thing to get control.  It's another thing to

25   go around asking for third parties to turn over estate

1    assets under 542.

2             For example, in a Chapter 11 case it would,

3    by definition not be the debtor who had the asset,

4    there would have to be a complaint filed under Section

5    542.

6             MS. BLANCO:  Well, and I think that that's

7    appropriate as well, but the order giving Mr. Glasgow

8    that right would not obviate his requirement to file

9    the complaint, it would just give him the right to

10   file the complaint.

11            THE COURT:  Just recognizing that he has the

12   initial right to file the complaint.  So you're not

13   today asking for specific funds to be turned over?

14   There's the control provision in 1521 that you've

15   asked for.

16            MS. BLANCO:  Well, the control provision I

17   have is, and I actually have it -- I don't have the

18   1521 cite.

19            THE COURT:  Let me just draw the distinction

20   for you.  If BAICO is the named owner of an asset, and

21   the petitioner is given the power to control that

22   asset under the entrustment provision of 1521, then

23   that's self executing.

24            542 is used for something else entirely.

25   That's when somebody claims a legal right because

1  they've been given a piece of property, for example,

2  and it's to be returned to the estate as a result of a

3  complaint.  Those are two different things.

4          MS. BLANCO:  Right.  And the proposed order,

5  which I framed as an exercise to prepare for the

6  hearing today, has the entrustment provision that is

7  referenced under 1521(a)(5), just as the Court has

8  referenced it.

9          What I'm trying to avoid is the step in

10  between anticipating that if, in fact, these funds are

11  not available or liquid as they should be, that

12  there's going to be resistance and avoiding of the

13  step in between, which is coming back to this Court to

14  ask for a right that it requires then Mr. Glasgow to

15  file a complaint in either case.

16          THE COURT:  As a condition to the complaint,

17  an intervening request.

18          MS. BLANCO:  But I don't think that this

19  1521 relief, Your Honor, obviates due process from

20  whoever claims a right.  And I think the entrustment

21  provision, and the issue of whether someone has been

22  given property, there's a fine line there, because

23  it's all in the mind of whoever is holding it.

24          And so I'm not suggesting that the Court

25  even could empower Mr. Glasgow to obviate that party's

1   due process rights, I'm just suggesting that because

2   of the exigency given that these are funds, that the

3   Court not require Mr. Glasgow to come back here to ask

4   for the right to file a complaint when, in fact, he

5   can just do that if he deems it appropriate.  And it's

6   not going to take away any due process right from the

7   recipient, on the contrary.

8           THE COURT:  Because they would still be

9   served with a complaint.

10          MS. BLANCO:  Absolutely.  Any U.S. creditor

11  is served with a similar complaint, get those same

12  rights.  So it's not any sort of special interest or

13  anything that's being --

14          THE COURT:  Okay.  So why specifically

15  implicate 363, which seems to be you requesting a

16  limit on the petitioner.

17          MS. BLANCO:  Well, perhaps at this juncture,

18  Your Honor, if the Court is uncomfortable --

19          THE COURT:  I'm not saying I'm

20  uncomfortable, I'm just curious about the request.

21          MS. BLANCO:  The request is just because we

22  don't know what's going to be out there if we find a

23  tangible piece of property that needs to be sold or

24  disposed of quickly, 363 is appropriate.

25          That doesn't mean that Mr. Glasgow has any

1    issue with coming back to this Court and asking for

2    permission if he discovers.  Perhaps that's

3    appropriate.  It's just part of the request that the

4    Court is entitled to provide, and I think Mr. Glasgow,

5    as a foreign representative, has the ability to report

6    to this Court, and the obligation to report to this

7    Court when such an asset is sold or disposed of either

8    way.

9              So the question is, how does he frame the

10   request.  Does he have the right from this point

11   forward to frame the request, or does he have to first

12   ask to have that right, and then make the request.

13   It's the same sort of analysis that I just made with

14   the 542 or 549 rights.

15             The fact that he has the ability to make the

16   request, makes it a one step process as opposed to

17   having to come here, ask the Court for that right, and

18   then have the 363 sale motion filed, or disposition

19   motion filed.

20             THE COURT:  Understood.  I asked the

21   question because in a Chapter 11 case there's

22   automatically the limit with regard to outside the

23   ordinary course transactions.  It wasn't apparent that

24   that was already there in Chapter 15, nonetheless.

25             All right.  Very good.  Anything else?

1        MS. BLANCO:  No.  I think that I've covered

2   it all, Your Honor.

3        THE COURT:  Mr. Dubosar.

4        MR. DUBOSAR:  Well, I came in here prepared

5   with a very serious and lofty argument about why

6   entrustment would be okay, but don't allow

7   distribution, and I don't have to make that

8   argument.

9        Based on what I've heard, they're only

10  looking to be entrusted with possession in the United

11  States of those assets which Mr. Glasgow would have a

12  claim to, based on his appointment in the case, SVG.

13  And as long as the order is very clear that those

14  assets remain in the United States pending further

15  order of this Court, we really have no objection to

16  the entrustment.

17       THE COURT:  So there was a hint in at least

18  one of your statements, Ms. Blanco, that suggested

19  that you wanted to move some funds currently held in

20  some funds held in the U.S. to another fund in the

21  U.S. held by the petitioner, or to a fund outside of

22  the United States?

23       MS. BLANCO:  Your Honor, at the moment

24  there's no -- because of the process, it's under way

25  with regard to British American.  There's no immediate

1    need --

2              THE COURT:  To move the funds outside of the

3    country.

4              MS. BLANCO:  To move the funds outside

5    of the country.  Mr. Dubosar asked me that before the

6    hearing.  We didn't have a chance to sort of finish

7    the conversation, perhaps we would have shortened this

8    up a bit.  But the fact of the matter is, Mr. Glasgow

9    is content at the moment to be able to move the funds

10   in to a protected account here in the U.S. within his

11   control, if we could get our hands on them, and not

12   move them subject to order of the Court.

13             MR. DUBOSAR:  So having just finished a

14   trial at the beginning of this week, I was up since

15   2:30 in the morning going over that great argument of

16   mine, but I'll save it for another day in another

17   case.

18             But underpinning that argument was going to

19   be the fact that both under the predecessor provisions

20   for comity and protection of creditors under 304, the

21   case law as you know, said, those survive and they're

22   actually embodied in 1521, throughout Chapter 15, 21,

23   and 15, 22.

24             The second concern that we had was really

25   the scope of the stay that would be imposed by this

1    Court.  We understand stay against execution makes

2    sense under the circumstances, but when considering

3    the interest of this particular creditor, and the

4    circumstances of this and the companion case, we

5    wanted to ask that we not be stayed from at least

6    liquidating our claim in the United States.

7              And there are cases which talk about

8    convenience in liquidating here or in the foreign

9    jurisdiction, but our concerns are really practical in

10   nature.  When I say the corresponding case, if you

11   don't mind, just to digress for a minute into the case

12   that Judge Hyman gave to you.

13             THE COURT:  I see, all right.  I was going

14   to ask about the nature of the underlying claims in

15   the pending Florida action so that I can get an idea

16   of what's there, what happened in it.

17             MR. DUBOSAR:  Sure.  Let me give you a

18   little procedural history.  Ms. Blanco was probably

19   about 85 percent accurate in describing the

20   transaction.  I don't think it really makes a

21   difference for today's hearing.

22             But basically Green Island Holdings was the

23   hundred percent member of a company called Green

24   Island Ventures.  Green Island Ventures had this Green

25   Island property that Leyza went hiking on, under

1    contract.  And then this company, British American

2    Insurance, BVI, which is the petitioner in the new

3    case, acquired, entered into a contract with my

4    client, Green Island Holdings, to acquire one hundred

5    percent of the membership interest in Green Island

6    Ventures.

7              Then Green Island Ventures with funding for

8    whoever, we don't have evidence on that yet, went

9    ahead and closed on the purchase of the property, and

10   as you heard, the sellers took back the purchase

11   money.

12             THE COURT:  But the purchase was not a

13   direct interest in the real property, it was through

14   an LLC.

15             MR. DUBOSAR:  Correct.  My clients had

16   property under contract with the Partons and their

17   various entities.  Before my clients closed on it, the

18   membership interest in the LLC that had the contract

19   purchasing rights was acquired by BVI.

20             THE COURT:  And so that means that the

21   subsidiary then actually obtained title, that did, in

22   fact, happen.

23             MR. DUBOSAR:  That's correct.

24             THE COURT:  And between the time that that

25   subsidiary entered into a contract to purchase the

1  real property, its membership interest was sold to the

2  other debtor.

3          MR. DUBOSAR:  British American BVI, correct.

4  You've got it.

5          And right now, as you've heard, there's an

6  underlying foreclosure action pending against the

7  title owner of the property, the Green Island Ventures

8  entity, whose membership interests are owned by BVI.

9          THE COURT:  And who is the plaintiff in

10  that?

11          MR. DUBOSAR:  The plaintiff is -- I'm not a

12  party in the case, but it's the Parton family entities

13  that were the sellers of the property and took back

14  the mortgage.

15          At some point in time, although a number of

16  payments had been made to my clients on the note they

17  took back to sell the membership interest, there was

18  some 38 million dollars, give or take, that had not

19  been made.

20          So we brought an action to do two things in

21  Federal Court before Judge Marra, to foreclose on the

22  pledge of the membership interest.  Because when we

23  sold the membership interest they were actually

24  certificated, put in escrow with the escrow agent of

25  Proskauer Rose, to stand as collateral for the note

1    that my client took back in selling the interest.

2            And secondly, at one point during the

3    modification British American, the entity involved in

4    this case, guaranteed the debt.  So we brought a

5    single claim before Judge Marra to sue on the note, to

6    foreclose the security interest in the membership

7    interest against BVI, and against British American

8    in the guarantee.

9            We just thought it would be easier,

10   notwithstanding the fact that for some reason the

11   guarantee had a forum selection clause placing the

12   guarantee litigation in Osceola, we figured it would

13   be easier to litigate in one place.

14           And classic defensive strategy, not Ms.

15   Blanco's firm, but those who were defending the

16   British American entity before Judge Marra, moved to

17   transfer, so we have to litigate all over the place.

18           In the British American BVI case that was

19   before Judge Marra, literally when we closed -- we had

20   a motion for summary judgment pending, they filed the

21   responses, they filed their affidavits in opposition,

22   and then they filed this petition.  So that's been

23   fully briefed, the affidavits filed, and Judge Marra

24   was probably pretty close to being ready to make a

25   decision.

1          That's when I got a phone call coming out of

2   trial that Judge Hyman had an emergency hearing, and

3   he entered a stay, and that case is here.

4          The other litigation that we then had to

5   commence in Osceola because of the enforcement of

6   forum selection clause, we actually had a clerk's

7   default entered in that case.

8          We were at the stage of having the Judge

9   enter final judgment on that default, and that's when

10  Ms. Blanco entered the picture.  Because Holland and

11  Knight, who had been in the case, withdrew -- or

12  actually I don't even know if they appeared in that

13  one, I know they appeared in Federal Court, and there

14  was a last minute request for a continuance of that

15  hearing.  Ms. Blanco wanted to file proposed defenses

16  and come up with this since that default.

17         That hearing did get put off, and prior to

18  ever getting to that hearing the petition before Your

19  Honor was filed in this case.

20         THE COURT:  And the matter in the State

21  Court, that was the guarantee.

22         MR. DUBOSAR:  That was the guarantee.

23         THE COURT:  Because it was pushed out.

24         MR. DUBOSAR:  Correct.

25         So putting that now -- now that you have the

1   procedural context, as you'll hear from me in the BVI

2   case as to why we want stay relief to liquidate that

3   claim, and even beyond that, because we're a secured

4   creditor in that case.

5          In this particular case, to protect the

6   interest of our client as a creditor, we think there's

7   a strong public policy interest in ensuring that we

8   can liquidate the claim here.

9          Number one, we have documents that are to be

10  enforced under Florida law, and it would be helpful to

11  have a Florida Court do that as opposed to some

12  liquidating Judge in St. Vincent.

13         Number two, the lion's share of the

14  witnesses are here.  The transactional documents were

15  executed here.  The property, to the extent it plays a

16  role in any of this, is located here.  And it would be

17  really not only inconvenient, but expensive for the

18  creditor in this case, my client, to have to go and

19  prove all of that off in some other country under

20  potentially some other set of laws.

21         So when I was going to make the argument

22  about some of the consideration of the creditor

23  interest for purposes of distribution, those also

24  apply with equal, if not stronger force here, as to at

25  least allowing us to liquidate the claim.

1              The defenses that have been proposed have

2      all been raised under Florida law.  It just makes a

3      whole lot more sense to litigate it here.

4              The other reason why we would want stay

5      relief not to execute, but to liquidate our claim, is,

6      we believe that through discovery in the State Court

7      litigation, which I suppose there may be some basis to

8      do it here, but in the State Court litigation we

9      believe we will find that assets were fraudulently

10     transferred from British American Insurance to third

11     parties, such as its parent company, CL Financial.

12             So the type of discovery that we would want

13     to do in that case that would be stayed if you stayed

14     continuation in that case, could undermine my client's

15     ability not only to liquidate its claim, but also to

16     pursue claims against potential third parties on

17     fraudulent transfer and related types of claims.

18             So without getting into all of the great

19     case law I was going to quote chapter and verse today

20     on the other issue, I know Your Honor is familiar with

21     the body of law, in looking at the interest of

22     creditors, any harm that may be occasioned by them

23     having to defend through judgment on a claim in State

24     Court, is far outweighed by all the other factors that

25     I've mentioned, and it would be redundant to go into

1    them.

2              Also the burden that they face is no greater

3    than the money they're already spending defending the

4    foreclosure case against the Partons, and I looked at

5    the docket and they are actively defending that.

6              So in this particular case we would love to

7    be able to liquidate the claim on the guarantee and do

8    that third party discovery.  I'll save my BVI

9    arguments, which are a little more involved, for when

10   we get in front of you on that one.

11             THE COURT:  Now what makes this different

12   from any other relief from stay provision with regard

13   to a piece of litigation which is admittedly an

14   unsecured debt in a large insolvency action?

15             I mean, we have something where normally one

16   of the goals of the centralized insolvency is to

17   preserve the time and effort to deal with claims.  Why

18   not bring that claim into the action?

19             Assuming there's nothing completely strange

20   or, I hesitate to use this word, foreign, to what

21   we would view as an appropriate way of handling

22   liquidation, why wouldn't it be appropriate to leave

23   this claim in that process?  What makes it different

24   from the usual 362(d) claim?

25             MR. DUBOSAR:  Well, just to state the

1  obvious, we're not with a debtor commencing a case

2  under Chapter 11 or Chapter 7 in this case.

3          When you look at the scheme under Chapter

4  15, after there's recognition, when we're dealing with

5  a non-main proceeding such as this, you have

6  discretion to decide whether to apply that or not.

7          If it was supposed to be automatic, it would

8  be stated as automatic as it is under Title 11

9  generally, and we're operating under a very different

10 set of circumstances.

11         Then when you consider the fact that they

12 really need to come in here and explain to you why

13 they need that stay, the burden is on them because

14 it's not automatic, you're supposed to look under

15 1521, 1522, the cases both under 304 and Chapter 15,

16 as to the interest of the creditors as well as the

17 interest of the petitioner in this case.

18         And the factors that I've given you militate

19 in favor as to why it would be appropriate to allow a

20 domestic creditor with domestic plans governed under

21 Florida law to liquidate those claims here.

22         Now, where I thought you were going for a

23 minute is, why couldn't I just remove the case and

24 resolve it here in this court.  I would have no

25 objection --

1          THE COURT:  I wasn't going there.

2          MR. DUBOSAR:  I thought you were for a

3    minute.  I saw you go away from that.

4          THE COURT:  I was focusing more on, I think

5    you've answered the question, you're saying that this

6    is an issue of whether the 1521 stay should apply.  I

7    was approaching it from, if it applies, should relief

8    be granted.  A slightly different point of view.  And

9    that's why I was asking you why this would be

10   different from any other 362(d) type argument.

11         MR. DUBOSAR:  I understood, and because

12   we're dealing with a different statutory scheme, it's

13   not automatic.  That's why they need to seek it.  You

14   gave it provisionally under 1519, but today's hearing

15   is to determine whether to continue it, and then they

16   need to prove the need to do that.

17         And you know, these cases, some of the

18   cases, many of which were cited in our opinion for

19   other reasons, talk about protection of creditors and

20   these various types of concerns.

21         So given the balance of interest here, and

22   given the fact that we're not seeking to execute on

23   assets but merely to litigate through judgment, have

24   stay relief through judgment, especially when you

25   consider those potential third party claims against

1   who there should be no stay, for whom --

2          THE COURT:  So why couldn't they be pursued,

3   if they're there, why couldn't they be pursued

4   independently, why is it necessary to be doing

5   discovery in one action in order to pursue somebody

6   else?

7          MR. DUBOSAR:  Again, in my world of

8   litigation, I always like to question before I shoot,

9   and in this particular case, while there's reason to

10  suspect there's bases for fraudulent transfer, I would

11  want to do that discovery.

12         And in the ordinary case where you're a

13  creditor seeking to liquidate your claim through

14  judgment, you would be able to look at third parties

15  to determine whether you can bring claims under 726,

16  or proceeding supplementary if it's post judgment.

17         Here we have to stop the judgment.  If we

18  couldn't do proceeding supplementary, but I should at

19  least be a diligent lawyer and do my analysis under

20  726 before I proceed to name third parties.

21         THE COURT:  I'm not suggesting that.  I'm

22  just asking why you couldn't do some investigation,

23  and if you find what you think is a valid claim, the

24  usual, I can never remember the statute that's the

25  equivalent of Rule 11 in Florida, but --

1          MR. DUBOSAR:  57105.

2          THE COURT:  Right.  And then do what you

3     need to do and then pursue those claims under 726 if

4     they exist.

5          MR. DUBOSAR:  We were limited in the extent

6     of investigation we can do without subpoena power.  We

7     need to do serious discovery on those issues.

8          And I don't focus my attention so much on

9     that, as to undercut the important fact that we do

10    have the witnesses here and we have the facts here,

11    and we have the Florida law that should be applied.

12    All of those factors should be considered whether you

13    grant their request to stay now that they've been

14    recognized as a non-main.

15         THE COURT:  I have to tell you, I do not

16    know the answer to the question I'm about to ask,

17    which is always dangerous.

18         Why can't you use Rule 2004 to examine both

19    the debtor, the petitioner in this instance through

20    the debtor, or other entities?  I don't know the

21    answer to that.  I haven't actually looked to see

22    whether it applies or does not apply.

23         MR. DUBOSAR:  The answer is, that's a

24    definite maybe, and one that I've given consideration

25    to.  But enumerating all of the other concerns that

1    militate in favor of liquidating the claim in State

2    Court, that's a factor that I think should be

3    considered by the Court as well.

4            THE COURT:  Thank you.  Ms. Blanco.

5            So the request is to allow the liquidation

6    of this claim in the State Court in Florida, the

7    guaranteed one.

8            MS. BLANCO:  Your Honor, the Court asked the

9    perfect question.  Because if the issue is to conduct

10   discovery on fraudulent conveyances or potential

11   actions, Florida law limits the ability of a creditor

12   in a two party dispute to discovery relating to that

13   dispute.  You can't just simply conduct post judgment

14   discovery just because --

15           THE COURT:  Let's not go there.  I'd rather

16   focus on --

17           MS. BLANCO:  Well, but --

18           THE COURT:  I understand I asked that

19   question, and I think I got the answer that I needed,

20   I don't need to hear any more argument on that.

21           I want to focus on whether the stay under

22   1521 should be limited, there should be a little

23   carve-out, which is the argument being made by Mr.

24   Dubosar, to allow for the liquidation of this

25   particular unsecured claim.

1          MS. BLANCO:  Your Honor, no one is saying

2     that the unsecured claim can't be liquidated in the

3     United States.

4          The issue here is whether it's done here in

5     this court, which is the court that is best suited to

6     determine claims, and to the extent that through the

7     discovery that this Court may order appropriate,

8     directed by Mr. Glasgow in this proceeding, there may

9     be claims by this debtor against this claimant.

10          And to allow this claimant to continue

11     through judgment may put this debtor in the position

12     where there's a judgment against it, and if it has

13     claims against the creditor, they are now -- there's a

14     res judicata affect perhaps of some judgment, it

15     forces Mr. Glasgow to defend that lawsuit in the

16     District Court case or in the State Court case as

17     opposed to here.

18          There's no question that this Court has the

19     ability, if there are, for example, claims in the

20     nature of the type that this Court is used to hearing,

21     such as fraudulent transfers, that are discovered

22     through the process of investigation, that this Court

23     wouldn't be the appropriate Court for which to have

24     those transfers determined.

25          I'm not certain, Your Honor, what the

1   discovery in this proceeding may bring to light.  But

2   going back to the question this Court asked regarding

3   the transaction which is the underlying basis for Mr.

4   Dubosar's client's claim, that transaction was a same

5   day transaction of a sale of a single asset entity.

6            That single asset entity bought a piece of

7   land for the approximate amount of 220 million

8   dollars, and sold it to this debtor on the same day,

9   or its affiliate, for 295 million dollars.  And it is

10  a large transaction that, for the most part, would

11  make most single asset entities insolvent, and even

12  entities as large as BAICO insolvent.

13           So just on a purely superficial level,

14  looking at the same transaction that Mr. Dubosar more

15  accurately described to the Court, on its face there

16  are perhaps more issues that need to be investigated.

17  And if that means that there are Florida law claims

18  that this debtor is entitled to bring, perhaps the

19  appropriate venue to do that is here.

20           THE COURT:  In what way?  Are you suggesting

21  there's going to be a claims process in this court in

22  connection with BAICO?  That doesn't seem very

23  practical.

24           MS. BLANCO:  It does not, Your Honor, but I

25  hear the creditor saying it prefers that.  I'm not

Page 47

1    sure what --

2              THE COURT:  I don't think I heard that,

3    actually.

4              MS. BLANCO:  The creditor is saying that it

5    prefers its claim determined in the United States as

6    opposed to having to litigate its claim elsewhere.

7              THE COURT:  I think he meant in the State

8    Court.

9              MS. BLANCO:  Well, and that's a problem,

10   because if this Court, like this Court made the

11   distinction, if this Court finds that this debtor

12   could be the subject of or is meritorious of a 362

13   stay, this creditor is no different from any other

14   unsecured creditor.

15             And the fact of the matter is that

16   permitting a stay carve-out, which isn't written into

17   the stay, to permit this liquidation, perhaps raises

18   other issues that impairs the debtor's ability to

19   defend against this claim.

20             This claim may not be a claim that is valid

21   in the eyes of an insolvency perspective, and as a

22   result, Your Honor, at the moment there's nothing

23   lost, there's no harm in respect to the balancing of

24   interests that Mr. Dubosar has argued is appropriate

25   here, to stay all efforts in respect to that claim.

1  There is not a process in place to adjudicate that

2  claim.  Mr. Glasgow has not forced this creditor to

3  come to St. Vincent and the Grenadines to prove up its

4  claim.

5         Perhaps that's going to be appropriate at

6  some point in time, and this Court can then decide

7  whether it's appropriate to have this creditor

8  litigate and liquidate its claim here, or in District

9  Court, or in St. Vincent.

10         But as we sit here today, without having

11  done the discovery that this Court is so aptly able to

12  order and authorize Mr. Glasgow to do, and without Mr.

13  Glasgow having the ability to accurately and

14  completely figure out what defenses and what

15  affirmative claims it may have against Mr. Dubosar's

16  client to permit him to carve-out the 362 stay, that

17  would otherwise be generally applicable to a creditor

18  such as this, to permit it to liquidate its claim is

19  very harmful to the debtor and doesn't create any harm

20  to the creditor.

21         Because simply stated, at this juncture, the

22  creditor just simply has to sit by and -- the defenses

23  and the affirmative claims the creditor has to support

24  its underlying debt don't change with the passage of

25  time.

1          What changes with the passage of time in

2    respect to this case is what Your Honor orders, and

3    that is discoverable information here in the U.S. that

4    may empower this debtor, or its affiliate, or both, to

5    bring to light, whether here or in another court

6    in the U.S., or in a foreign court, the fact that the

7    underlying creditor may have no claim.

8          And as a result, Your Honor, to carve it

9    out, and to force Mr. Glasgow, or any other affiliate

10   to litigate against this creditor in the different

11   court, when this Court is apt and capable to do it at

12   the appropriate time, is simply just causing

13   irreparable harm, a waste of judicial efficiency, and

14   money from the debtor's estate, because it's expensive

15   to do.

16          THE COURT:  All right.  One of the questions

17   I always ask in the Chapter 11 context when there's a

18   request for relief from stay under 362(d) to continue

19   with litigation is, where is that litigation?  It has

20   been pending for five years and they've done all their

21   discovery, and they were involved in jury selection at

22   the time the case was filed, and that's a little

23   different.

24          Here we have a default judgment -- excuse

25   me, a default entered --

Page 50

1          MS. BLANCO:  A clerk's default.

2          THE COURT:  A clerk's default, I understand.

3    Why was there a clerk's default entered in this

4    matter?

5          MS. BLANCO:  Simply stated, because Mr.

6    Lopez and Mr. Glasgow, at the time that the default

7    was entered, were not in place.  So this was a company

8    with no directors, who were served -- there was an

9    issue that was brought to this Court's awareness

10   in the beginning of the case before recognition of the

11   fact that there was an issue of trying to serve the

12   company in the Bahamas, and whether it was

13   appropriately incorporated there, et cetera, et

14   cetera.

15         But the short story is, Your Honor, it had

16   no one to defend it.  And so there was a clerk's

17   default.  Then Mr. Lopez was appointed.  He sought

18   U.S. counsel.  I came in to vacate the clerk's

19   default, and that's where we were.  So not very far

20   at all.

21         And in respect to the other litigation

22   respecting the same debt, it's at a summary judgment

23   stage and it's an '09 case.  We're not talking about a

24   three year stint with a jury trial pending and lots of

25   time and investment.  This is a suit on a promissory

Page 51

1    note and --

2           THE COURT:  On a guarantee, on a guarantee,

3    against this particular debtor.

4           MS. BLANCO:  Against this particular debtor.

5    It's a debt case.  So it's not the kind of case where

6    it merits for good cause a carve-out under 362(d).  If

7    we were framing this in connection with a relief from

8    stay hearing, and I was defending this on behalf of a

9    Chapter 11 debtor, this is simply, quite frankly,

10   textbook, the application of the stay is textbook in

11   respect to this particular claim.

12          And I don't think that the fact that this is

13   a Chapter 15 or otherwise makes it any different, and

14   I don't think that the harm to this debtor is less

15   because this is a 15.  It's the same.

16          And if the Court carves it out, it's going

17   to cause the same harm to this estate that it would if

18   it carved out for this creditor under any other

19   Chapter proceeding.

20          THE COURT:  Mr. Dubosar, you looked like you

21   were about to jump up.

22          MR. DUBOSAR:  I always look that way.

23          There were a couple of things that were said

24   that I'm not sure were addressed on the first go

25   round.

1              To the extent that funds of British American

2     that go beyond those to which Mr. Glasgow has been

3     entrusted with, were somehow to be stayed, there would

4     be prejudice.  Because remember, he only has some

5     number that's invested here that isn't even clear at

6     this point.

7              THE COURT:  You're suggesting that there

8     should be some numerical limit on the extent of any

9     stay granted in connection with 521 for a non-main

10    proceeding?

11             MR. DUBOSAR:  Sure.  Because he's been

12    entrusted with the assets of British American St.

13    Vincent and the Grenadines, and I thought that there

14    was some dialogue about that during the initial

15    presentation that's suggested there's an issue out

16    there, that if he only has an interest in some

17    percentage of an asset, that's the percentage he would

18    be entrusted with.

19             THE COURT:  Does that make practical sense?

20    Can that possibly be what 521 means, that there should

21    be limited execution according to some extremely

22    preliminary analysis?  Isn't the question, is it

23    appropriate that a particular foreign representative

24    be given control over assets of the debtor?  Because

25    that's how it's worded.

1          MR. DUBOSAR:  You know, it's interesting,

2   because there's a lot of dicta that would suggest

3   that, I think in the Bear Stearns case and one of the

4   other cases that doesn't come to mind immediately, but

5   I can grab it, that did suggest that when you're

6   dealing with a non-main it would be only as to the

7   assets that can be controlled by that particular

8   petitioner.

9          But the other point that I wanted to make,

10  unless you still have questions about the percentage

11  issue, is, there was talk about they haven't even come

12  up with a procedure yet in St. Vincent and Grenadines

13  for my client to pursue a claim, because --

14          THE COURT:  There's no liquidation in place.

15  It's contemplated.

16          MR. DUBOSAR:  And one of the concerns that

17  obviously exists, and this goes back to why the

18  percentage issue could be very important, if they've

19  said in there that if they wind up liquidating as

20  opposed to reorganizing, then policy holders will get

21  money, the other creditors will not.

22          And this really goes into the argument I

23  didn't have to make this morning, one of the things

24  you have to look at is whether creditors would be

25  treated differently in their proceeding than they

Page 54

1    would in a proceeding under Federal --

2            THE COURT:  Is that really what that

3    provision means, that I --

4            MR. DUBOSAR:  Yeah.  There's actually a case

5    that involves a Bahamian company, where under the

6    Bahamian liquidation provision the administrative

7    expenses could have been used to prime the claims of

8    secured creditors with the secured creditors own

9    collateral.  And the Court in that case said, we're

10   not going to let you do this, because under our law,

11   the secured creditor can't be primed by those types of

12   administrative expenses.

13           So there really is an issue out there.  I

14   grant you, that's not what you --

15           THE COURT:  Isn't that protecting -- I

16   assume it involved the United States security

17   interest --

18           MR. DUBOSAR:  Correct.

19           THE COURT:  -- isn't that protecting a

20   United States security interest when we have various

21   foreign proceedings is the central, wherever it's

22   happening, in this case a foreign non-main proceeding,

23   are they somehow going to honor the priorities of all

24   of the countries in which they've made investments?

25           MR. DUBOSAR:  No, I don't think that's the

1  case.  But when an important mechanism for priority is

2  totally disregarded, that is something that a Court in

3  this country should consider.

4       In this particular case, there's going to be

5  this super unsecured class of creditors called policy

6  holders, everybody else gets nothing.

7       And we are getting ahead of ourselves.

8  That's only when we get to whether anything is going

9  to be distributed.  It certainly has something to do

10  with that percentage of asset to be taken.  And when

11  you look at the reports you see that St. Vincent

12  funded some things, they didn't fund all things, it's

13  not clear what percentage they may have funded.

14       For Green Island, for example, it's not --

15  well actually that's pretty well set forth, it's not

16  clear whether they funded anything for the Corban

17  funded issue here.

18       But again, if we're entrusting without

19  prejudice to argue the distribution issues and the

20  percentage issues another day, my focus is, given the

21  concerns of protecting the creditor's interest, given

22  all of the things I mentioned about witnesses, law,

23  convenience, expense, it is appropriate not to grant

24  stay relief, but to deny the application of the stay

25  to, or the ability to liquidate our claim in State

1   Court.  We're not asking you to allow us to grab

2   assets, we're only asking you to allow us to complete

3   that claim.

4            It's the same way possible, for example, the

5   Judge is going to deny the motion to vacate.  Although

6   they've pled defenses, pretty much the same thing they

7   pled in Federal Court, that Judge Marra was bent to

8   rule on that summary judgment, we are at least at that

9   point in the litigation where it shouldn't be a major

10  issue, particularly if the judgment is going to be

11  entered.  If the judgment is not going to be entered,

12  these are the types of issues that would be

13  appropriate to litigate.

14           Now, when Ms. Blanco kept saying, maybe we

15  should bring it into this court, I would have no

16  objection to removing the case, I'm not sure that you

17  can do that.

18           THE COURT:  I cannot tell you at this moment

19  whether I think the Bankruptcy Court would have

20  jurisdiction under those circumstances.  I don't see

21  anything in Chapter 15 which gives me the power to end

22  up being the claims processing center or a foreign

23  proceeding, and I doubt that that was intended in the

24  monologue.

25           MR. DUBOSAR:  I agree with you.  Believe me,

1    I looked for it, because that would have been fine as

2    well.  But I think the only way we can pursue our

3    claim and get it resolved one way or the other under

4    State law, is to do it in that proceeding that's

5    currently pending.

6                THE COURT:  Thank you.  Do you wish to add

7    anything?  I hesitate to ask (laughter).

8                MS. BLANCO:  Your Honor, under the Consort

9    (phonetic) case, which was recently decided, this

10   Court may have more powers under 15 than we imagine,

11   including adjudicating not simply a claim, but perhaps

12   an affirmative claim under foreign law under a Chapter

13   15.

14                So I'm not suggesting that we need to go

15   there at the moment, and I think that's the important

16   thing, is the timing.  At the moment this debtor is a

17   large debtor that's undergoing a major process of

18   reorganization and liquidation.  And there's provision

19   under 1527 specifically which permits this Court to

20   have information directly from the Court from the

21   foreign representative as to any changes, status, et

22   cetera.

23                Perhaps the Court in fashioning this relief

24   wants to direct that when and if Mr. Glasgow files a

25   report in the St. Vincent and Grenadines proceeding,

1    and/or a request to do any of the kinds of things he's

2    been directed to do, that this Court be made aware so

3    that this Court can, at that juncture, consider any

4    prejudice.

5            But there's simply no prejudice to this

6    creditor at the moment from being stayed in

7    litigation, and there's a lot of prejudice for the

8    litigation going through judgment, particularly if

9    claims are discovered that would negate that the

10   creditor has any claim at all.

11           And I'm not sure that in this particular

12   instance if, in fact, these claims are going to end up

13   being a consolidated claims process in St. Vincent and

14   the Grenadines or somewhere else in the world, which

15   may complicate matters for this Court at some juncture

16   in the future, but whatever the case may be, I don't

17   have a crystal ball to know how it's all going to

18   fashion itself.

19           There may not be any policy holders at all

20   at the end of the day, there may be lots.  I'm not

21   sure that that mitigates in favor of carving of a stay

22   to permit this particular creditor to have a judgment

23   that's liquidated when this potential debtor has

24   claims or maybe defenses or both, that may mitigate

25   against that amount.

1          I think that that's the issue.  And I think

2     the timing is what's critical, and I don't think this

3     Court is bound to decide that now.  I think this Court

4     may issue a broad and prospective stay and can modify

5     that when it deems it appropriate as the case develops

6     elsewhere, and I think this Court has, within Chapter

7     15, the ability and the tools necessary to be informed

8     as to when and if situations change in the foreign

9     proceeding which can permit it to adjust the scope of

10    the stay if applicable.  And I think that's what's

11    important.

12          THE COURT:  Which is the petitioner's duty

13    under Chapter 15.  So I would expect reports.  If the

14    petitioner wishes to file additional reports that

15    aren't necessarily directly required under Chapter 15,

16    more power to them, I'm glad to read them when they

17    arrive.  But there is an affirmative duty, and I

18    should just remind you, an affirmative duty to update

19    me with regard to anything that has an impact on

20    relief previously granted, and that goes back to the

21    recognition itself.

22          MS. BLANCO:  And that's correct, Your Honor.

23          So I think at this juncture, given that that

24    is written into the Chapter 15 statute specifically,

25    it contemplates exactly the situation where perhaps at

1   the moment, for timing sake, there's not a particular

2   need, and looking at 362 there's really not a basis

3   for a carve-out, but perhaps one might arise.  I just

4   don't know enough yet about how the foreign proceeding

5   is going to develop to understand how and if that may

6   raise an issue that might rise to the level of harm to

7   a creditor from the stay, but we're just not there.

8              THE COURT:  All right.  Well, and I did

9   focus both of you on, to some extent, on whether or

10  not what was being requested by Mr. Dubosar's client

11  was a limitation on the relief under 1521, or relief

12  from that after it's granted in Judge Cristol's court.

13  That is just so many items on the head of a pin

14  probably, and I may have gone too far.

15             I think that in my view, the claim that you

16  have currently, the guarantee claim, it is a typical

17  unsecured claim.  I don't think it's appropriate to

18  either limit the stay requested or grant relief at

19  this stage.  But this is without prejudice to a later

20  motion for relief from the order which I'll enter as a

21  result of today's hearing.

22             I think that things may change, the passage

23  of time may have an impact, and I will want to hear

24  from the foreign representative what has been

25  discovered in this process, and essentially what

1    defenses there really are to the claim in the Florida

2    State Court.

3         I do think there is some small amount of, I

4    use comity, you've mentioned it several times, that's

5    comity with a foreign jurisdiction, but comity with

6    the State Court with regard to the treatment that

7    occurs after a default has been entered, and I'm

8    cautious about that.

9         But I think at this point this is an

10   unsecured claim, and I don't think it's appropriate to

11   limit the generalized relief which would be

12   appropriate in connection with this particular

13   non-main proceeding.

14        The reason I asked in particularly about the

15   references in the October 9, 2009 report of the

16   judicial manager to the Court in St. Vincent and the

17   Grenadines was that I do think it is important that

18   with regard to Mr. Dubosar's client, that the

19   investment at issue was at a minimum funneled through,

20   and to a great extent came from this particular

21   branch.  Does it matter to me that it is, at least

22   based on the information currently available, 43.4

23   million out of 125.4, no it does not.

24        MR. DUBOSAR:  If I could just interrupt, and

25   I'm sorry to do that.

1           THE COURT:  Yes.

2           MR. DUBOSAR:  What we were talking about was

3      the Corban Fund, because the --

4           THE COURT:  Understood.  I understand.  And

5      the Corban Fund is separately treated.  And according

6      to the report, the Corban Fund investment came from

7      the EC branches, and the report does not say exactly

8      where it came from.

9           I'm not sure that that's necessarily

10     important under the circumstances here.  I think that

11     there's ample evidence in what I've received in the

12     prior trial to show that there's good reason, in

13     addition to the order appointing the judicial manager,

14     good reason that this particular non-main proceeding

15     should be accorded relief under Section 1521.

16          I think for me to rule otherwise would

17     eviscerate Section 1521.  I think that it's there for

18     a reason with regard to non-main proceedings.  There's

19     certainly some limitations potentially on the relief

20     that the Court might grant, and there's a great deal

21     of discretion there.

22          I think given what I've learned about the

23     interplay of this particular entity with others

24     involved in the overall British American group of

25     family of companies, it certainly makes sense for this

1    particular foreign representative to have the relief

2    that's been requested here.

3            If there is another proceeding that's

4    recognized, then we may have a different situation.

5    Obviously a Chapter 15 involves a potential jumble of

6    rights as things change over time.

7            But in the meantime, I think the relief

8    requested is appropriate under the circumstances.  I'd

9    like today to see the proposed order and how you have

10   suggested the interplay of Sections 361, 363, 542, and

11   549.

12           I caution you not to include a reference, an

13   unlimited reference to the additional relief, or the

14   catch-all provision in 1521(a)(7), that is the source

15   of, at least partly the source of my authority to

16   enter relief under 362, and the other provisions you

17   cited in the other sources that this provision clearly

18   is not intended to be exclusive.  It allows for the

19   possibility that there be other relief granted, and

20   specifically uses the word, including, in Subsection

21   (a), and I think that's certainly precedent for a

22   general application of the stay that would otherwise

23   be available under Title 11.

24           So I will do that.  And I'd like to see the

25   order, and I would like you to submit it, also share

1   it with Mr. Dubosar of course, but submit it to my

2   chambers mailbox in Word format so that I can

3   manipulate it as I see fit.

4          MR. DUBOSAR:  I was going to say, just to

5   avoid any back and forth, our only issue is with the

6   paragraph that talks about entrusting.  I just want it

7   very clearly spelled out that the accounts in which

8   the money will be deposited will be in the United

9   States under the jurisdiction of this Court, and that

10  nothing goes from the peninsular to the island without

11  Your Honor's permission.

12         THE COURT:  Very good.

13         MS. BLANCO:  And there's no problem with

14  that, we agree with that language.  So I will have to

15  make some edits as a result of that, as well as this

16  Court's direction in respect to the certain issues

17  under 362.

18         THE COURT:  And it would be helpful to me, I

19  realize that you oppose the relief overall, but it

20  would be helpful to me if I knew that the order as

21  it's presented was acceptable, given my ruling,

22  acceptable to Mr. Dubosar, if you could please

23  circulate it as we usually do.

24         MS. BLANCO:  I will.  I'll red line it from

25  what he's already seen, because I had provided one

1   prior to the hearing, and make sure that he's seen it

2   before we propose or --

3            THE COURT:  And rather than upload it, send

4   it to chambers e-mail box and copy Mr. Dubosar, and

5   that way I can, if I think necessary, make changes

6   to the document.

7            MS. BLANCO:  Very good, Your Honor.  Thank

8   you.

9            THE COURT:  While I have both of you here, I

10  have scheduled a preliminary hearing on the other

11  petition, the sole purpose of which was to talk about

12  scheduling.  If you have no objection, I'll do it now.

13  If you prefer to wait until that hearing, I'm glad to

14  do it.  I don't want to press you.

15           MS. BLANCO:  I was not aware of the

16  preliminary hearing.  When was that set?  I've been

17  out of town --

18           MR. DUBOSAR:  I don't think notice has gone

19  out on that yet.

20           THE COURT:  It hasn't, okay.

21           MS. BLANCO:  Because unfortunately, in

22  respect to that case, the foreign representative is

23  not present, so his schedule I know has some issues at

24  the end of May, early June, so scheduling is important

25  in that particular instance, because he would be

1    required to be present, and I want to make sure that

2    to the extent we're having a preliminary hearing for

3    scheduling purposes, that he, at a minimum, is on the

4    telephone.

5            THE COURT:  Let me talk to Ms. Jaffy.

6            It's probably scheduled for May 20th, which

7    is a week from now.

8            MS. BLANCO:  Actually, that will work, Your

9    Honor, because I just happen to know off the top of my

10   head that Mr. McDonald is going to be out of the

11   country -- out of the United States and the British

12   Virgin Islands between the 22nd and the 4th, so the

13   20th would be good for purposes of scheduling a final

14   hearing in which he is going to need to be present.

15   He may need to be in attendance by phone if that's

16   okay with Your Honor.

17           THE COURT:  That's what I was going to ask

18   each of you.  Unless there's something else you're

19   about to tell me next week, and I know there's been an

20   interim order under 1519 already entered by Judge

21   Hyman, I was thinking we would set up a conference

22   call.  I don't know that I need to send everybody here

23   to this courthouse in order to talk about scheduling

24   issues, unless there's something else that needs to be

25   addressed.

1           MR. DUBOSAR:  And if I just heard the words,

2    final hearing, it shouldn't come as a surprise to you

3    that given the history of Mr. Lopez' petition, we want

4    to take discovery, because you can't consider the face

5    value that you had in comity that you have even

6    establishment.  It was only through discovery that we

7    determined that wasn't the case in Mr. Lopez'

8    situation.

9           So in this BVI one, we're going to be doing

10   discovery, the only thing that might be brought to the

11   Court's attention sooner rather than later would be a

12   motion for stay relief.

13          THE COURT:  All right.  And if you do that,

14   I would have to have a full hearing, obviously.

15          MR. DUBOSAR:  Sure.

16          THE COURT:  But in the mean time, if we're

17   going to discuss scheduling, maybe one of you can set

18   up a conference call that I can dial in to, and we can

19   do it at whatever time -- Michelle, do you know the

20   time -- I think we might be moving it.  It's in the

21   middle of my motion calendar, which as both of you

22   know, completely prohibits me from being able to call

23   anybody else.  So perhaps the way to do that would be

24   to set it later in the day on that same day as a

25   conference call.

Page 68

```
 1              MR. DUBOSAR:  I have a deposition that
 2    afternoon at 1:30.  I can probably try and get an
 3    associate to cover it for me.
 4              THE COURT:  If it's solely about scheduling,
 5    we can do it at another time.  I could even put it on
 6    Wednesday in the middle of the day.
 7              MR. DUBOSAR:  Wednesday the 19th?
 8              THE COURT:  Correct.  Ms. Blanco, what do
 9    you think, you don't know?
10              MS. BLANCO:  Well, I do know that on
11    Wednesday I'm going to be speaking at --
12              THE COURT:  That's right.
13              MS. BLANCO:  -- association panel, but that
14    runs from about, I would say 11:30 safely to about
15    3:00 safely, so we could do a later conference that
16    day.
17              THE COURT:  So rather than have a
18    preliminary hearing in the middle of my motion
19    calendar with 50 other matters on, let's have
20    Ms. Klopp coordinate with both of you, if you could
21    call her, figure out whether a time is convenient,
22    because really, this is just about scheduling and we
23    can set aside 30 minutes and talk about what you will
24    need, maybe a scheduling order, given what Mr. Dubosar
25    has to say.
```

1        MS. BLANCO:  I will coordinate with her as

2   well, and I would want to have my client present,

3   because his schedule is, particularly for purposes of

4   discovery, critical, since he has to fly in, actually

5   he has a difficult sort of flight schedule to get

6   here, because it's got a few stops, there's no way to

7   get direct, so I want to make sure that we consider

8   his flight schedule when we decide on discovery

9   schedules.

10       THE COURT:  Of course.  Absolutely.  And

11  anybody that each of you think is necessary, can be on

12  the phone, it will be on the record.

13       MR. DUBOSAR:  And obviously, we'll endeavor

14  to come up with a scheduling order before we have the

15  conference call, as we were able to do the last time.

16       THE COURT:  Okay.  I have a form of

17  scheduling order I started to use.  You can ask one of

18  my law clerks for it.  And it says, it's very simple,

19  you can embellish it if you wish, don't feel married

20  to it, but the idea is to set out some deadlines and

21  make sure that they're measured reasonably back for an

22  evidentiary hearing.

23       MS. BLANCO:  Is that scheduling order

24  specifically designed for Chapter 15 cases?

25       THE COURT:  Thankfully, I haven't gotten

1    that far yet.  It's for contested matters, I've been

2    using it for contested matters.

3                MS. BLANCO:  We will get that.

4                MR. DUBOSAR:  Very good.  Thank you.

5                THE COURT:  We're adjourned.

6                (The proceedings were concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 71

1             .

2                  C E R T I F I C A T E

3

4    The State of Florida      )

5    County of Palm Beach      )

6

7             I, JACQUELYN ANN JONES, Court Reporter,

8    certify that I was authorized to and did

9    stenographically report the foregoing hearing; and

10   that the transcript is a true record of my

11   stenographic notes.

12            I further certify that I am not a relative,

13   employee, attorney or counsel of any of the parties,

14   nor am I a relative or employee of any of the parties'

15   attorney or counsel connected with the action, nor am

16   I financially interested in the action.

17

18            In witness whereof I have hereunto set my

19   hand and seal this  2nd  day of  August, 2010.

20

21                    _____

22                    JACQUELYN JONES

23                    Commission DD 846540

24                    Expires Feb 18, 2013

25